**In re Michael Carver VAN VLECK, Debtor.**

**David A. SOSNE, Trustee, Plaintiff,**

v.

**Candice C. VAN VLECK and Michael Carver Van Vleck, Defendants.**

**Bankruptcy No. 96–41356–293.**
**Adversary No. 96–4269–293.**

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

Aug. 19, 1997.

John J. Hall, Summers Compton Wells & Hamburg, St. Louis, MO, for Plaintiff.

Stuart J. Radloff, Radloff & Riske, Clayton, MO, for Defendants.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(H), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

1. On February 22, 1996 Michael C. Van Vleck filed a petition seeking relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. §§ 101–1330).

2. The Trustee subsequently filed this adversary proceeding alleging that the Debtor had transferred assets fraudulently. Specifically, the Trustee argues that nearly two and one half years worth of payments on Debtor's mortgage and transfers made to pay for repairs and maintenance to the home of the Debtor and his non-debtor spouse owned for two and one half years before filing bankruptcy constituted fraudulent transfers under a provision of Missouri's version of the Uniform Fraudulent Transfer Act (Mo.Rev.Stat. § 428.024 (1994)). The Trustee maintains his position despite the facts that none of the challenged mortgage payments were prepayments and the transfers for repairs and maintenance were made in the ordinary course of the family's financial affairs.

3. Debtor and his wife filed a timely answer to the Trustee's complaint.

4. The Court held a hearing at which counsel for the Trustee and for the Defendants appeared and presented argument.

## FACTUAL FINDINGS

The Parties stipulated to the following facts:

1. Debtor, Michael C. Van Vleck (sometimes "Michael") is a Debtor under a Chapter 7 proceeding filed by him on February 22, 1996. David A. Sosne is the duly appointed, acting and qualified Trustee ("Trustee").

2. Michael has been married to Candice Van Vleck (sometimes "Candice") for approximately 28 years. Candice is not a Debtor in any bankruptcy proceeding.

3. As of the date of bankruptcy, Michael was employed by Bechtel Corporation as a human relations manager, and had been so employed for 3½ years. His base salary, exclusive of overtime and overseas allowances, was $5,840.00 per month.

4. The Van Vlecks have two daughters, ages 19 and 20. During most off their marriage, Candice has maintained the household and raised the children. Michael is the only source of financial support for the family.

5. In approximately 1984, Michael became a 20 percent general partner in a real estate partnership known as Exeter Development Company ("Exeter"). Exeter owned an office building in Richardson, Texas, the purchase of which was financed through a loan from Alice Savings and Loan ("Alice") for approximately $7,000,624.86, and secured by a deed of trust upon the office building.

6. The managing general partner of Exeter was Ronald White (sometimes "White") who was responsible for the partnership finances.

7. In approximately 1985, Exeter defaulted on its note to Alice, and the office building was taken over by the savings and loan. Michael moved out of state and had limited contact with Exeter or White after 1986, and was not apprized of as to the disposition of the office building until after 1994.

8. In 1989 a judgment was entered in Dallas County, Texas in favor of Allied Bank (now "First Interstate Bank") for $14,930.00 against Exeter and its partners, including

Michael, as a 20 percent partner, based upon an original loan to Exeter in the sum of $50,000.00. Michael was not living in Texas at the time and although the partnership was represented by counsel, Michael, individually, was not.

9. In 1993, after living in Foster City California for three years, Michael moved to St. Louis, Missouri.

10. In August of 1993, Michael and Candice purchased a home at 13688 Sturbridge Road in St. Louis County for approximately $225,000.00 (the Sturbridge house or the Sturbridge home). The title to said residence was taken in joint name between Michael and Candice, as husband and wife.

11. To finance the purchase of the Sturbridge house, Michael and Candice took out a loan from United Postal Savings ("UPS") (and subsequently assumed by Mercantile Mortgage)[1] in the sum of $202,500.00, and evidenced by a promissory note signed jointly by Michael and Candice.

12. The remaining balance due under the purchase price came from monies furnished solely by Candice. At closing, Candice furnished Lawyers Title Company with a check for $22,761.92, which monies represented proceeds of a stock gift from her father in Washington Water Power Company.

13. The payments on the home loan to UPS, while subject to variable adjustments, averaged approximately $1,500.00 per month. This was almost exactly the same amount that Michael and Candice had been paying in rent for the preceding three years in California, and this level of housing expense was consistent with Michael's income.

14. At the time Michael and Candice purchased the Sturbridge house, Michael's annual income was approximately $100,000.00, and they were current in all their personal debts and obligations. Insofar as business debts were concerned, Michael had heard nothing from White or Exeter or any of its creditors since approximately 1989. No legal process had ever been made or served upon him by

---

1. Although the Van Vlecks' mortgage was ultimately assumed by Mercantile Mortgage, the Court, for simplicity, will refer to the loan as one held by UPS and to the payments made as payments made to UPS.

Allied Bank with respect to its 1989 judgment for $14,930.00, and Michael had assumed that said judgment for $14,930.00 had either been paid or otherwise satisfied by the partnership or other general partners. Had he been aware that said judgment was still outstanding, Michael possessed sufficient property and income to have paid it in full, even though he was only a 20 percent partner of Exeter.

15. At the time of its purchase, the Sturbridge house was approximately 30 years old, and was in need of a number of repairs and maintenance; the previous owners having neglected both the interior and exterior of said home. Many of these improvements, such as cleaning, painting, and wallpapering, were done by Candice, as Michael's work had him assigned overseas at all relevant times herein. Other mechanical repairs, such as plumbing and electrical work, were done periodically by contractors hired by Michael and Candice, when they could afford to do so. The work that was performed was primarily in the nature of basic repairs and replacement. Among the specific repairs/replacements were replacement of a furnace, dishwasher, toilets, water heater, roof repairs and carpeting. Total out of pocket expenses for these improvements, including basic maintenance, from the date of purchase in August of 1993 through the filing of the bankruptcy in February of 1996 totaled approximately $23,032.00 with the majority of the repairs and renovation occurring within the first six months after the Van Vlecks moved in. The $23,032.00 total, funded solely from Michael's earnings, is based upon a comprehensive list of all expenditures made by the Van Vlecks on their home, and includes many basic everyday expenses such as the purchase of garden mulch ($26.43), top soil ($1.90), plumbing supplies ($8.45) and dishwasher repairs ($18.50). Total time expended by Candice in doing physical improvements herself, or in obtaining bids and overseeing repairs, during the period August 1993 to September 1995 is approximately 760 hours.

16. At the time of filing, the monthly loan payment on the house covering principal and interest was $1,273.92. in addition, the monthly escrow for taxes and insurance was $358.35, for a total payment of $1,632.27.

17. During the period of approximately 30 months from the time of purchase of the house in August of 1993 until the filing of the bankruptcy on February 22, 1996, Michael and Candice made approximately 30 monthly payments to UPS totaling $48,243.00 (which included the insurance and tax escrow). These payments were funded solely from Michael's earnings.

18. Each and every one of the above-referenced 30 payments was made in the ordinary course of financial affairs for Michael and Candice, as said payments came due. No pre-payments or lump sum payments were ever made out of the ordinary course.

19. Of the approximately $48,242.00 in total payments made to UPS, the majority of said payments were allocated to interest and escrow. At the time of filing, the loan balance of $202,500.00 had been reduced to $195,628.93, such that $6,871.07 of the $48,242.00 had been applied to the reduction of principal.

20. In mid–1994, about one year after the purchase of the residence, Michael was contacted by an attorney in Ohio on behalf of Value Recovery Group Joint Venture No. 1 ("VRJV"). The attorney informed Michael that VRJV was the alleged successor in interest to Alice on the promissory note Exeter executed, having purchased the same under assignment from the RTC (Resolution Trust Corporation). He also asserted that a deficiency existed against Exeter after foreclosure of the office building in Texas, and requested a settlement upon that claim. Michael was totally unaware of the existence of any such claim at the time the house was purchased in August of 1993, and the communication from the attorney in Ohio in 1994 represented his first knowledge that a deficiency liability existed in connection with the Richardson office building. Neither Michael, Exeter nor any of the other partners was able to reach a settlement with VRJV. Ultimately, VRJV filed suit and won a judgment against the Exeter Partnership which was entered in the county court for Dallas Coun-

ty, Texas on or about February 23, 1995, in the sum of $3,844,078.00.

21. Said judgment was subsequently registered as a foreign judgment in the Circuit Court of St. Louis County and a garnishment against Michael ensued and was filed in approximately December, 1995.

22. On February 22, 1996, Michael filed the present Chapter 7 proceeding. The Trustee has examined Michael and has not discovered any assets upon which to administer. The bankruptcy schedules indicate that the Van Vlecks were driving 5 year old (1991 Honda Accord) and 12 year old (1984 Honda Civic) cars when Michael filed bankruptcy. Aside from his home loan to UPS, the only debts scheduled pertain to the Exeter Partnership in Texas, and included the VRJV judgment which arose from the loan made in 1984 from Alice Savings & Loan, and a debt to Republic Credit One, L.P. for $1,596,-715.00.

23. Until the entry of the judgment in favor of VRJV relating to Exeter, Michael and/or Candice were possessed of sufficient income and assets to pay all of their known debts as said debts became due.

24. Candice was not involved in any way with Exeter, was generally unaware of its dealings, and was unaware of any claim by VRJV at the time of the purchase of the house and that period of time during which virtually all of the renovations and repairs were made to the house.

25. At all times relevant herein, being from August, 1993 until February 22, 1996, Michael was married to Candice and as her husband was the sole financial source of support for her and their two children, neither of whom was emancipated. During said period of time, Candice, in addition to the labors and services heretofore described, also provided a household for Michael and provided the marital services of a spouse to Michael, as her husband.

### DISCUSSION

The section of Missouri's fraudulent transfer act primarily at issue provides:

**428.024 Transfers fraudulent as to present and future creditors,-**

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation:

. . . . .

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

. . . . .

(b) Intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

■ The Trustee contends that under section 428.024 1.(2)(b) intent is irrelevant. He argues that to prove a fraudulent transfer under Missouri law a plaintiff need only demonstrate that the transfer was not supported by sufficient consideration and that the transferor should have believed that he would incur debts beyond his ability to pay. Applying the relevant law to the case at bar, the Trustee maintains that Debtor transferred assets to a separate entity, namely entireties property, at a time when he was insolvent due to the existence of two partnership debts. The fact that the Defendants did not know of the partnership debts or that the debts had not been satisfied (and therefore did not know that they were insolvent) the Trustee maintains, is irrelevant. The Court disagrees.

Section 428.024.1(2)(b) requires that a debtor "intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due." These words suggest that there is a subjective component to a constructively fraudulent transfer. If a debtor does not know of a liability or reasonably believes that the liability has been satisfied, then, as this Court reads section 428.024.1(2)(b), he cannot effect a constructively fraudulent transfer because he can neither intend to incur nor be expected to hold a reasonable belief that he is incurring (or would incur) debts beyond his ability to pay as they come due.

The Trustee has pointed to two debts of the Exeter partnership and argued that their existence renders the Debtor's payments made under his mortgage and the payments he made to effect repairs to his home fraudulent as against his creditors. The Court will consider each debt in turn.

■ As a preliminary matter, the Court notes that the relevant time for examining whether Debtor's mortgage payments were fraudulent transfers is August 1993, the time when Debtor incurred the obligation to make those payments. *See* Mo.Rev.Stat. § 428.034(5)(b) (obligation is incurred when writing is executed and delivered). As to the $1,569,713 debt representing the deficiency judgment from the loan Alice made to Exeter (now held by VRJV), the parties have stipulated that Debtor was "totally unaware of the existence of any such claim at the time the house was purchased in August of 1993" and that he first learned about the claim based upon the deficiency in mid–1994 when an attorney for VRJV contacted him. The information that a party possesses determines what he or she may believe. Because Debtor did not know of the existence of the $1,569,-713.00 debt in August 1993, he cannot be expected to have considered that debt in determining whether his incurring the mortgage obligation would render him unable to pay his debts as they would come due. In other words, the existence of the $1,569,-713.00 debt will not affect whether the mortgage payments and outlays for repairs were fraudulent transfers.

■ The Court will now consider the effect of the partnership debt Debtor owed to Allied Bank. The parties have stipulated that in 1989 a judgment was entered "against Exeter and its partners, including Michael" on the $14,930.00 partnership debt owed to Allied Bank. The mere existence of this debt and Defendants' knowledge of it does not render fraudulent either the payments Debtor made to effect repairs to the Sturbridge house or the incursion of the mortgage liability against it. Rather, the Court must determine whether when he made those payments Debtor intended to incur or could have been expected to hold a reasonable belief that he was incurring (or would incur) debts beyond his ability to pay as they come due. The Court concludes that Debtor's incursion of the mortgage obligation on the Sturbridge home was not fraudulent on account of the $14,930.00 debt's existence because it did not render him unable to pay his debts as they came due in light of the fact that he was earning an annual salary of approximately $100,000.00 in 1993. Although the parties have not stipulated to the salary Debtor earned during 1994, 1995 and 1996, they did stipulate that the majority of the repairs to the Sturbridge house were completed within the first six months after Defendants purchased the home. The Court concludes that, given Debtor's $100,000.00 salary as of August 1993, his expenditure of the majority of $23,032.00 for necessary repairs to the home he had recently purchased was not fraudulent on account of the $14,930.00 debt's existence because it did not render him unable to pay his debts as they came due. The Court's conclusions are bolstered by the parties' stipulation that "[h]ad [Debtor] been aware that [$14,930.00 the Allied Bank] judgment was still outstanding, Michael possessed sufficient property and income to have paid it in full."

■ In addition to containing a constructive intent element, section 428.024.1(2)(b) requires that a transfer be made, or obligation incurred, without the debtor receiving reasonably equivalent value. The Trustee has challenged as fraudulent, thirty regular mortgage payments of $1,632.27 each. The parties have stipulated that $358.35 of each mortgage payment represented taxes and insurance. Additionally, the Court notes that the majority of each monthly mortgage payment made during the first few years after one executes a mortgage pays interest and not principal. In fact, the parties have stipulated that when Debtor filed his petition, only $6,871.07 of the $48,242.00 of mortgage payments (or 14 percent) Debtor had made on the Sturbridge house had been applied to reduce the principal owed. To the extent that the challenged mortgage payments constituted taxes, insurance and interest, the Debtor unquestionably received reasonably equivalent value for the transfer, there being no suggestion that these items were charged at a price other than the going market rate.

Also relevant to the reasonably equivalent value issue is the parties' stipulation that the mortgage payment Debtor paid each month approximated the rent he and his family had paid for their housing in California during the three years immediately preceding their move to Missouri and that such a housing budget was appropriate to Debtor's earning level. The fact that Debtor had previously paid rent in an amount approximating the mortgage payments the Trustee challenges suggests that the mortgage was within the Debtor's means and also that the exchange held value for the Debtor.[2]

 The Trustee has alternatively argued that the case at bar is replete with badges of fraud from which the Court may infer a fraudulent intent. Applying the badges of fraud to the case at bar would involve invoking a different part of section 428.024. That part of the statute provides:

**428.024 Transfers fraudulent as to present and future creditors.-**

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor

. . . . .

2. In determining actual intent under subdivision (1) of subsection 1 of this section, consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The badges of fraud are, in the language of the statute "considerations" or evidence of a fraudulent intent and do not raise an irrebuttable presumption of fraud. *See* Francis X. Buckley, *The Missouri Uniform Fraudulent Transfer Act,* 50 J.Mo.B. 89, 90 (1994). In the case at bar there are badges of fraud that suggest that the incursion of the mortgage obligation and payments for repairs were fraudulent and there are badges of fraud that, by their absence suggest that those transfers were not fraudulent. Among the badges suggesting that the transfers were fraudulent as to Debtor's creditors are: that to the extent that the repairs improved Defendants' house and the mortgage payments generated equity in Defendants' home, they can be said to have accrued to the benefit of insiders, namely Defendants, and in that same way can be viewed as transfers over which Debtor retained control of the transferred property. On the other hand, the transfers were not concealed, Debtor did

---

**2.** The Court realizes that the cost of living in California is generally greater than that in Missouri though the parties have not presented evidence of this. Further, the Court does not rest its conclusion that the challenged mortgage payments were not fraudulent on the fact that because the rent Debtor paid in California approxi-

mated the monthly mortgage payment on the Sturbridge house. Rather, the Court notes that the relative equality of the rent and mortgage payments suggests that Debtor received reasonably equivalent value in the form of shelter or housing for him and his family.

not abscond, the transfers were not of substantially all of Debtor's assets and the transfers did not occur shortly after Debtor incurred a substantial debt.

One badge of fraud which points both ways is whether Debtor had been sued or threatened with suit before the transfers occurred. At least as far as the $14,930.00 debt is concerned, the answer is yes, Debtor had been sued on this debt before he either incurred the mortgage obligation in August of 1993 or contracted to have the repairs to his home performed. The Court, however, believes the significance of the pre-transfer suit on the $14,930.00 debt is mitigated by the facts that the judgment on this debt was entered against Debtor more than four years earlier and no effort to collect that judgment directly from Debtor had been made by August of 1993.

Similarly, the badge of fraud relating to whether Debtor received reasonably equivalent value points both toward the existence of a fraudulent transfer and toward the legitimacy of the challenged transfers. On the one hand, the Trustee's argument that the Debtor did not receive equivalent value for the portions of the mortgage payments that contributed to Defendants' equity in the Sturbridge house has a certain appeal because, at least from the creditors' point of view, such transfers accrued to the benefit of Defendants at the creditors' detriment. A similar picture can be painted as to the funds expended repairing the Sturbridge house. On the other hand, Debtor and his family required housing and the mortgage payments and funds used to make repairs to the house provided the family with housing commensurate with the Debtor's salary and status.

Having considered all the badges of fraud, the Court concludes that Debtor's incursion of the mortgage on his family's home on ·Sturbridge and the funds he expended in repairing that property were not transfers in fraud of his creditors.

An Order consistent with this Memorandum Opinion will be filed this date.